# SUPREME COURT OF THE UNITED STATES

No. 10–179

## HOWARD K. STERN, EXECUTOR OF THE ESTATE OF VICKIE LYNN MARSHALL, PETITIONER v. ELAINE T. MARSHALL, EXECUTRIX OF THE ESTATE OF E. PIERCE MARSHALL

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 23, 2011]

JUSTICE SCALIA, concurring.

I agree with the Court's interpretation of our Article III precedents, and I accordingly join its opinion. I adhere to my view, however, that—our contrary precedents notwithstanding—"a matter of public rights . . . must at a minimum arise between the government and others," *Granfinanciera, S. A.* v. *Nordberg,* 492 U. S. 33, 65 (1989) (SCALIA, J., concurring in part and concurring in judgment) (internal quotation marks omitted).

The sheer surfeit of factors that the Court was required to consider in this case should arouse the suspicion that something is seriously amiss with our jurisprudence in this area. I count at least seven different reasons given in the Court's opinion for concluding that an Article III judge was required to adjudicate this lawsuit: that it was one "under state common law" which was "not a matter that can be pursued only by grace of the other branches," *ante,* at 27; that it was "not 'completely dependent upon' adjudication of a claim created by federal law," *ibid.;* that "Pierce did not truly consent to resolution of Vickie's claim in the bankruptcy court proceedings," *ibid.;* that "the asserted authority to decide Vickie's claim is not limited to a 'particularized area of the law,'" *ante,* at 28; that "there was

never any reason to believe that the process of adjudi-
cating Pierce's proof of claim would necessarily resolve
Vickie's counterclaim," *ante,* at 32; that the trustee was
not "asserting a right of recovery created by federal bank-
ruptcy law," *ante,* at 33; and that the Bankruptcy Judge
"ha[d] the power to enter 'appropriate orders and judg-
ments'—including final judgments—subject to review only
if a party chooses to appeal," *ante,* at 35.

Apart from their sheer numerosity, the more fundamen-
tal flaw in the many tests suggested by our jurisprudence
is that they have nothing to do with the text or tradition of
Article III. For example, Article III gives no indication
that state-law claims have preferential entitlement to an
Article III judge; nor does it make pertinent the extent to
which the area of the law is "particul: ized." The multi-
factors relied upon today seem to have entered our juris-
prudence almost randomly.

Leaving aside certain adjudications by federal adminis-
trative agencies, which are governed (for better or worse)
by our landmark decision in *Crowell* v. *Benson,* 285 U. S.
22 (1932), in my view an Article III judge is required in *all*
federal adjudications, unless there is a firmly established
historical practice to the contrary. For that reason—and
not because of some intuitive balancing of benefits and
harms—I agree that Article III judges are not required in
the context of territorial courts, courts-martial, or true
"public rights" cases. See *Northern Pipeline Constr. Co.* v.
*Marathon Pipe Line Co.,* 458 U. S. 50, 71 (1982) (plurality
opinion). Perhaps historical practice permits non-Article
III judges to process claims against the bankruptcy estate,
see, *e.g.,* Plank, Why Bankruptcy Judges Need Not and
Should Not Be Article III Judges, 72 Am. Bankr. L. J. 567,
607–609 (1998); the subject has not been briefed, and so I
state no position on the matter. But Vickie points to no
historical practice that authorizes a non-Article III judge
to adjudicate a counterclaim of the sort at issue here.

BREYER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 10–179

## HOWARD K. STERN, EXECUTOR OF THE ESTATE OF VICKIE LYNN MARSHALL, PETITIONER *v.* ELAINE T. MARSHALL, EXECUTRIX OF THE ESTATE OF E. PIERCE MARSHALL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 23, 2011]

JUSTICE BREYER, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN, join dissenting.

Pierce Marshall filed a claim in Federal Bankruptcy Court against the estate of Vickie Marshall. His claim asserted that Vickie Marshall had, through her lawyers, accused him of trying to prevent her from obtaining money that his father had wanted her to have; that her accusations violated state defamation law; and that she consequently owed Pierce Marshall damages. Vickie Marshall filed a compulsory counterclaim in which she asserted that Pierce Marshall had unlawfully interfered with her husband's efforts to grant her an *inter vivos* gift and that he consequently owed her damages.

The Bankruptcy Court adjudicated the claim and the counterclaim. In doing so, the court followed statutory procedures applicable to "core" bankruptcy proceedings. See 28 U. S. C. §157(b). And ultimately the Bankruptcy Court entered judgment in favor of Vickie Marshall. The question before us is whether the Bankruptcy Court possessed jurisdiction to adjudicate Vickie Marshall's counterclaim. I agree with the Court that the bankruptcy statute, §157(b)(2)(C), authorizes a bankruptcy court to adjudicate the counterclaim. But I do not agree with the

majority about the statute's constitutionality. I believe
the statute is consistent with the Constitution's delegation
of the "judicial Power of the United States" to the Judicial
Branch of Government. Art. III, §1. Consequently, it is
constitutional.

## I

My disagreement with the majority's conclusion stems
in part from my disagreement about the way in which it
interprets, or at least emphasizes, certain precedents. In
my view, the majority overstates the current relevance of
statements this Court made in an 1856 case, *Murray's
Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272
(1856), and it overstates the importance of an analysis
that did not command a Court majority in *Northern Pipe-
line Constr. Co.* v. *Marathon Pipe L. e Co.*, 458 U. S.
50 (1982), and that was subse., antly disavowed. At the
same time, I fear the Court understates the importance of
a watershed opinion widely thought to demonstrate the
constitutional basis for the current authority of adminis-
trative agencies to adjudicate private disputes, namely,
*Crowell* v. *Benson*, 285 U. S. 22 (1932). And it fails to
follow the analysis that this Court more recently has held
applicable to the evaluation of claims of a kind before
us here, namely, claims that a congressional delegation
of adjudicatory authority violates separation-of-powers
principles derived from Article III. See *Thomas* v. *Union
Carbide Agricultural Products Co.*, 473 U. S. 568 (1985);
*Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S.
833 (1986).

I shall describe these cases in some detail in order to
explain why I believe we should put less weight than does
the majority upon the statement in *Murray's Lessee* and
the analysis followed by the *Northern Pipeline* plurality
and instead should apply the approach this Court has
applied in *Crowell*, *Thomas*, and *Schor*.

### A

In *Murray's Lessee*, the Court held that the Constitution permitted an executive official, through summary, nonjudicial proceedings, to attach the assets of a customs collector whose account was deficient. The Court found evidence in common law of "summary method[s] for the recovery of debts due to the crown, and especially those due from receivers of the revenues," 18 How., at 277, and it analogized the Government's summary attachment process to the kind of self-help remedies available to private parties, *id.*, at 283. In the course of its opinion, the Court wrote:

> "[W]e do not consider congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at t⸱ · common law, or in equity, or admiralty; no. ⸱n the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for judicial determination. At the same time there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." *Id.*, at 284.

The majority reads the first part of the statement's first sentence as authoritatively defining the boundaries of Article III. *Ante*, at 18. I would read the statement in a less absolute way. For one thing, the statement is in effect dictum. For another, it is the remainder of the statement, announcing a distinction between "public rights" and "private rights," that has had the more lasting impact. Later Courts have seized on that distinction when *upholding* non-Article III adjudication, not when striking it down. See *Ex parte Bakelite Corp.*, 279 U. S. 438, 451–452

(1929) (Court of Customs Appeals); *Williams* v. *United States,* 289 U. S. 553, 579–580 (1933) (Court of Claims). The one exception is *Northern Pipeline,* where the Court struck down the Bankruptcy Act of 1978. But in that case there was no majority. And a plurality, not a majority, read the statement roughly in the way the Court does today. See 458 U. S., at 67–70.

## B

At the same time, I believe the majority places insufficient weight on *Crowell,* a seminal case that clarified the scope of the dictum in *Murray's Lessee.* In that case, the Court considered whether Congress could grant to an Article I administrative agency the power to adjudicate an employee's workers' compensation claim against his employer. The Court assumed that an Art. 'e III court would review the agency's decision *d.* *novo* in respect to questions of law but it would conduct a less searching review (looking to see only if the agency's award was "supported by evidence in the record") in respect to questions of fact. *Crowell,* 285 U. S., at 48–50. The Court pointed out that the case involved a dispute between private persons (a matter of "private rights") and (with one exception not relevant here) it upheld Congress' delegation of primary factfinding authority to the agency.

Justice Brandeis, dissenting (from a here-irrelevant portion of the Court's holding), wrote that the adjudicatory scheme raised only a due process question: When does due process require decision by an Article III judge? He answered that question by finding constitutional the statute's delegation of adjudicatory authority to an agency. *Id.,* at 87.

*Crowell* has been hailed as "the greatest of the cases validating administrative adjudication." Bator, The Constitution as Architecture: Legislative and Administrative Courts Under Article III, 65 Ind. L. J. 233, 251 (1990).

Yet, in a footnote, the majority distinguishes *Crowell* as a case in which the Court upheld the delegation of adjudicatory authority to an administrative agency simply because the agency's power to make the "specialized, narrowly confined factual determinations" at issue arising in a "particularized area of law," made the agency a "true 'adjunct' of the District Court." *Ante*, at 23, n. 6. Were *Crowell's* holding as narrow as the majority suggests, one could question the validity of Congress' delegation of authority to adjudicate disputes among private parties to other agencies such as the National Labor Relations Board, the Commodity Futures Trading Commission, the Surface Transportation Board, and the Department of Housing and Urban Development, thereby resurrecting important legal questions previously t ught to have been decided. See 29 U. S. C. §160; 7 U. S. ८. §18; 49 U. S. C. §10704; 42 U. S. C. §3612(b).

C

The majority, in my view, overemphasizes the precedential effect of the plurality opinion in *Northern Pipeline*. *Ante*, at 19–21. There, the Court held unconstitutional the jurisdictional provisions of the Bankruptcy Act of 1978 granting adjudicatory authority to bankruptcy judges who lack the protections of tenure and compensation that Article III provides. Four Members of the Court wrote that Congress could grant adjudicatory authority to a non-Article III judge only where (1) the judge sits on a "territorial cour[t]" (2) the judge conducts a "courts-martial," or (3) the case involves a "public right," namely, a "matter" that "at a minimum arise[s] 'between the government and others.'" 458 U. S., at 64–70 (plurality opinion) (quoting *Ex parte Bakelite Corp.*, *supra*, at 451). Two other Members of the Court, without accepting these limitations, agreed with the result because the case involved a breach-of-contract claim brought by the bankruptcy trustee on

behalf of the bankruptcy estate against a third party who
was not part of the bankruptcy proceeding, and none of
the Court's preceding cases (which, the two Members
wrote, "do not admit of easy synthesis") had "gone so far as
to sanction th[is] type of adjudication." 458 U. S., at 90–91
(Rehnquist, J. concurring in judgment).

Three years later, the Court held that *Northern Pipeline*

"establishes only that Congress may not vest in a non-
Article III court the power to adjudicate, render final
judgment, and issue binding orders in a traditional
contract action arising under state law, without con-
sent of the litigants, and subject only to ordinary ap-
pellate review." *Thomas*, 473 U. S., at 584.

## D

Rather than leaning so heavily on the approach taken
by the plurality in *Northern Pipeline*, I would look to this
Court's more recent Article III cases *Thomas* and *Schor*—
cases that commanded a clear majority. In both cases
the Court took a more pragmatic approach to the constitu-
tional question. It sought to determine whether, in the
particular instance, the challenged delegation of adjudica-
tory authority posed a genuine and serious threat that one
branch of Government sought to aggrandize its own con-
stitutionally delegated authority by encroaching upon a
field of authority that the Constitution assigns exclusively
to another branch.

## 1

In *Thomas*, the Court focused directly upon the nature
of the Article III problem, illustrating how the Court
should determine whether a delegation of adjudicatory
authority to a non-Article III judge violates the Constitu-
tion. The statute in question required pesticide manufac-
turers to submit to binding arbitration claims for compen-
sation owed for the use by one manufacturer of the data of

another to support its federal pesticide registration. After describing *Northern Pipeline*'s holding in the language I have set forth above, *supra*, at 6, the Court stated that "*practical attention to substance* rather than doctrinaire reliance on formal categories should inform application of Article III." *Thomas*, 473 U. S., at 587 (emphasis added). It indicated that Article III's requirements could not be "determined" by "the identity of the parties alone," *ibid.*, or by the "private rights"/"public rights" distinction, *id.*, at 585–586. And it upheld the arbitration provision of the statute.

The Court pointed out that the right in question was created by a federal statute, it "represent[s] a pragmatic solution to the difficult problem of spreading [certain] costs," and the statute "does not pre ude review of the arbitration proceeding by an A ticle ... court." *Id.*, at 589–592. The Court concluded:

> "Given the nature of the right at issue and the concerns motivating the Legislature, we do not think this system threatens the independent role of the Judiciary in our constitutional scheme." *Id.*, at 590.

### 2

Most recently, in *Schor*, the Court described in greater detail how this Court should analyze this kind of Article III question. The question at issue in *Schor* involved a delegation of authority to an agency to adjudicate a counterclaim. A customer brought before the Commodity Futures Trading Commission (CFTC) a claim for reparations against his commodity futures broker. The customer noted that his brokerage account showed that he owed the broker money, but he said that the broker's unlawful actions had produced that debit balance, and he sought damages. The broker brought a counterclaim seeking the money that the account showed the customer owed. This Court had to decide whether agency adjudication of such a

counterclaim is consistent with Article III.

In doing so, the Court expressly "declined to adopt formalistic and unbending rules." *Schor*, 478 U. S., at 851. Rather, it "weighed a number of factors, none of which has been deemed determinative, with an eye to the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary." *Ibid.* Those relevant factors include (1) "the origins and importance of the right to be adjudicated"; (2) "the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts"; (3) the extent to which the delegation nonetheless reserves judicial power for exercise by Article III courts; (4) the presence or "absence of consent to an initial adjudication before a non-Article III tribuna""· and (5) "the concerns that drove Congress to dep·rt fro..." adjudication in an Article III court. *Id.*, at 849, o51.

The Court added that where "private rights," rather than "public rights" are involved, the "danger of encroaching on the judicial powers" is greater. *Id.*, at 853–854 (internal quotation marks omitted). Thus, while non-Article III adjudication of "private rights" is not necessarily unconstitutional, the Court's constitutional "examination" of such a scheme must be more "searching." *Ibid.*

Applying this analysis, the Court upheld the agency's authority to adjudicate the counterclaim. The Court conceded that the adjudication might be of a kind traditionally decided by a court and that the rights at issue were "private," not "public." *Id.*, at 853. But, the Court said, the CFTC deals only with a "'particularized area of law'"; the decision to invoke the CFTC forum is "left entirely to the parties"; Article III courts can review the agency's findings of fact under "the same 'weight of the evidence' standard sustained in *Crowell*" and review its "legal determinations . . . *de novo*"; and the agency's "counterclaim jurisdiction" was necessary to make "workable" a

"reparations procedure," which constitutes an important part of a congressionally enacted "regulatory scheme." *Id.*, at 852–856. The Court concluded that for these and other reasons "the magnitude of any intrusion on the Judicial Branch can only be termed *de minimis.*" *Id.*, at 856.

## II
### A

This case law, as applied in *Thomas* and *Schor*, requires us to determine pragmatically whether a congressional delegation of adjudicatory authority to a non-Article III judge violates the separation-of-powers principles inherent in Article III. That is to say, we must determine through an examination of certain relevant factors whether that delegation constitutes a significant encroachment by the Legislative or Executive Branches of 'overnment upon the realm of authority that Art.. J III reserves for exercise by the Judicial Branch of Government. Those factors include (1) the nature of the claim to be adjudicated; (2) the nature of the non-Article III tribunal; (3) the extent to which Article III courts exercise control over the proceeding; (4) the presence or absence of the parties' consent; and (5) the nature and importance of the legislative purpose served by the grant of adjudicatory authority to a tribunal with judges who lack Article III's tenure and compensation protections. The presence of "private rights" does not automatically determine the outcome of the question but requires a more "searching" examination of the relevant factors. *Schor, supra,* at 854.

Insofar as the majority would apply more formal standards, it simply disregards recent, controlling precedent. *Thomas, supra,* at 587 ("[P]ractical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III"); *Schor, supra,* at 851 ("[T]he Court has declined to adopt formalistic and unbending rules" for deciding Article III cases).

B

Applying *Schor's* approach here, I conclude that the delegation of adjudicatory authority before us is constitutional. A grant of authority to a bankruptcy court to adjudicate compulsory counterclaims does not violate any constitutional separation-of-powers principle related to Article III.

First, I concede that *the nature of the claim to be adjudicated* argues against my conclusion. Vickie Marshall's counterclaim—a kind of tort suit—resembles "a suit at the common law." *Murray's Lessee,* 18 How., at 284. Although not determinative of the question, see *Schor,* 478 U. S., at 853, a delegation of authority to a non-Article III judge to adjudicate a claim of that kind poses a heightened risk of encroachment on the Federal Judiciary. *Id.,* at 854.

At the same time the significance of this factor is mitigated here by the fact that bankruptcy courts often decide claims that similarly resemble various common-law actions. Suppose, for example, that ownership of 40 acres of land in the bankruptcy debtor's possession is disputed by a creditor. If that creditor brings a claim in the bankruptcy court, resolution of that dispute requires the bankruptcy court to apply the same state property law that would govern in a state court proceeding. This kind of dispute arises with regularity in bankruptcy proceedings.

Of course, in this instance the state-law question is embedded in a debtor's counterclaim, not a creditor's claim. But the counterclaim is "compulsory." It "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. Rule Civ. Proc. 13(a); Fed. Rule Bkrtcy. Proc. 7013. Thus, resolution of the counterclaim will often turn on facts identical to, or at least related to, those at issue in a creditor's claim that is undisputedly proper for the bankruptcy court to decide.

Second, *the nature of the non-Article III tribunal* argues in favor of constitutionality. That is because the tribunal

is made up of judges who enjoy considerable protection from improper political influence. Unlike the 1978 Act which provided for the appointment of bankruptcy judges by the President with the advice and consent of the Senate, 28 U. S. C. §152 (1976 ed., Supp. IV), current law provides that the federal courts of appeals appoint federal bankruptcy judges, §152(a)(1) (2006 ed.). Bankruptcy judges are removable by the circuit judicial counsel (made up of federal court of appeals and district court judges) and only for cause. §152(e). Their salaries are pegged to those of federal district court judges, §153(a), and the cost of their courthouses and other work-related expenses are paid by the Judiciary, §156. Thus, although Congress technically exercised its Article I power when it created bankruptcy courts, functionally, bankr ɔtcy judges can be compared to magistrate judges, law cle⹁ːs, and the Judiciary's administrative officials, whose lack of Article III tenure and compensation protections do not endanger the independence of the Judicial Branch.

Third, *the control exercised by Article III judges over bankruptcy proceedings* argues in favor of constitutionality. Article III judges control and supervise the bankruptcy court's determinations—at least to the same degree that Article III judges supervised the agency's determinations in *Crowell*, if not more so. Any party may appeal those determinations to the federal district court, where the federal judge will review all determinations of fact for clear error and will review all determinations of law *de novo*. Fed. Rule Bkrtcy. Proc. 8013; 10 Collier on Bankruptcy ¶8013.04 (16th ed. 2011). But for the here-irrelevant matter of what *Crowell* considered to be special "constitutional" facts, the standard of review for factual findings here ("clearly erroneous") is more stringent than the standard at issue in *Crowell* (whether the agency's factfinding was "supported by evidence in the record"). 285 U. S., at 48; see *Dickinson* v. *Zurko*, 527 U. S. 150,

152, 153 (1999) ("unsupported by substantial evidence" more deferential than "clearly erroneous" (internal quotation marks omitted)). And, as *Crowell* noted, "there is no requirement that, in order to maintain the essential attributes of the judicial power, all determinations of fact in constitutional courts shall be made by judges." 285 U. S., at 51.

Moreover, in one important respect Article III judges maintain greater control over the bankruptcy court proceedings at issue here than they did over the relevant proceedings in any of the previous cases in which this Court has upheld a delegation of adjudicatory power. The District Court here may "withdraw, in whole or in part, any case or proceeding referred [to the Bankruptcy Court] . . . on its own motion or on timely mot n of any party, for cause shown." 28 U. S. C. §157(d); cf. *Northern Pipeline*, 458 U. S., at 80, n. 31 (plurality opinion) (contrasting pre-1978 law where "power to withdraw the case from the [bankruptcy] referee" gave district courts "control" over case with the unconstitutional 1978 statute, which provided no such district court authority).

Fourth, the fact that *the parties have consented* to Bankruptcy Court jurisdiction argues in favor of constitutionality, and strongly so. Pierce Marshall, the counterclaim defendant, is not a stranger to the litigation, forced to appear in Bankruptcy Court against his will. Cf. *id.*, at 91 (Rehnquist, J., concurring in judgment) (suit was litigated in Bankruptcy Court "over [the defendant's] objection"). Rather, he appeared voluntarily in Bankruptcy Court as one of Vickie Marshall's creditors, seeking a favorable resolution of his claim against Vickie Marshall to the detriment of her other creditors. He need not have filed a claim, perhaps not even at the cost of bringing it in the future, for he says his claim is "nondischargeable," in which case he could have litigated it in a state or federal court after distribution. See 11 U. S. C. §523(a)(6). Thus,

Pierce Marshall likely had "an alternative forum to the bankruptcy court in which to pursue [his] clai[m]." *Granfinanciera, S. A.* v. *Nordberg,* 492 U. S. 33, 59, n. 14 (1989).

The Court has held, in a highly analogous context, that this type of consent argues strongly in favor of using ordinary bankruptcy court proceedings. In *Granfinanciera,* the Court held that when a bankruptcy trustee seeks to void a transfer of assets from the debtor to an individual on the ground that the transfer to that individual constitutes an unlawful "preference," the question of whether the individual has a right to a jury trial "depends upon whether the creditor has submitted a claim against the estate." *Id.,* at 58. The following year, in *Langenkamp* v. *Culp,* 498 U. S. 42 (1990) *(per curiam)* the Court emphasized that when the individual "iles a claim against the estate, that individual has

> "trigger[ed] the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power. If the creditor is met, in turn, with a preference action from the trustee, that action becomes part of the claims-allowance process which is triable only in equity. In other words, the creditor's claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's *equity jurisdiction.*" *Id.,* at 44 (quoting *Granfinanciera,* 492 U. S., at 58; citations omitted).

As we have recognized, the jury trial question and the Article III question are highly analogous. See *id.,* at 52–53. And to that extent, *Granfinanciera*'s and *Langenkamp*'s basic reasoning and conclusion apply here: Even when private rights are at issue, non-Article III adjudication may be appropriate when both parties consent. Cf. *Northern Pipeline, supra,* at 80, n. 31 (plurality opinion)

Case 3:11-ap-00068    Doc 19-2    Filed 07/07/11    Entered 07/07/11 09:20:10    Desc
Exhibit    Page 15 of 18

(noting the importance of consent to bankruptcy juris-
diction). See also *Schor*, 478 U. S., at 849 ("[A]bsence of
consent to an initial adjudication before a non-Article III
tribunal was relied on [in *Northern Pipeline*] as a signifi-
cant factor in determining that Article III forbade such
adjudication"). The majority argues that Pierce Marshall
"did not truly consent" to bankruptcy jurisdiction, *ante*, at
27–28, but filing a proof of claim was sufficient in *Lan-
genkamp* and *Granfinanciera*, and there is no relevant
distinction between the claims filed in those cases and the
claim filed here.

Fifth, *the nature and importance of the legislative pur-
pose served* by the grant of adjudicatory authority to
bankruptcy tribunals argues strongly in favor of constitu-
tionality. Congress' delegation of a ¨ ¨udicatory powers
over counterclaims asserted against bankruptcy claimants
constitutes an important means of securing a constitu-
tionally authorized end. Article I, §8, of the Constitution
explicitly grants Congress the "Power To ... establish ...
uniform Laws on the subject of Bankruptcies throughout
the United States." James Madison wrote in the Federal-
ist Papers that the

> "power of establishing uniform laws of bankruptcy is
> so intimately connected with the regulation of com-
> merce, and will prevent so many frauds where the
> parties or their property may lie or be removed into
> different States, that the expediency of it seems not
> likely to be drawn into question." The Federalist No.
> 42, p. 271 (C. Rossiter ed. 1961).

Congress established the first Bankruptcy Act in 1800.
2 Stat. 19. From the beginning, the "core" of federal bank-
ruptcy proceedings has been "the restructuring of debtor-
creditor relations." *Northern Pipeline, supra*, at 71 (plu-
rality opinion). And, to be effective, a single tribunal must
have broad authority to restructure those relations, "hav-

ing jurisdiction of the parties to controversies brought
before them," "decid[ing] all matters in dispute," and
"decree[ing] complete relief." *Katchen* v. *Landy*, 382 U. S.
323, 335 (1966) (internal quotation marks omitted).

The restructuring process requires a creditor to file a
proof of claim in the bankruptcy court. 11 U. S. C. §501;
Fed. Rule Bkrtcy. Proc. 3002(a). In doing so, the creditor
"triggers the process of 'allowance and disallowance of
claims,' thereby subjecting himself to the bankruptcy
court's equitable power." *Langenkamp, supra,* at 44 (quot-
ing *Granfinanciera, supra,* at 58). By filing a proof of
claim, the creditor agrees to the bankruptcy court's resolu-
tion of that claim, and if the creditor wins, the creditor will
receive a share of the distribution of the bankruptcy es-
tate. When the bankruptcy estate ╠ s a related claim
against that creditor, that counterclaim may offset the
creditor's claim, or even yield additional damages that
augment the estate and may be distributed to the other
creditors.

The consequent importance to the total bankruptcy
scheme of permitting the trustee in bankruptcy to assert
counterclaims against claimants, *and resolving those
counterclaims in a bankruptcy court,* is reflected in the
fact that Congress included "counterclaims by the estate
against persons filing claims against the estate" on its list
of "[c]ore proceedings." 28 U. S. C. §157(b)(2)(C). And it
explains the difference, reflected in this Court's opinions,
between a claimant's and a nonclaimant's constitutional
right to a jury trial. Compare *Granfinanciera, supra,* at
58–59 ("Because petitioners ... have not filed claims
against the estate" they retain "their Seventh Amendment
right to a trial by jury"), with *Langenkamp, supra,* at 45
("Respondents filed claims against the bankruptcy estate"
and "[c]onsequently, they were not entitled to a jury
trial").

Consequently a bankruptcy court's determination of

such matters has more than "some bearing on a bank-
ruptcy case." *Ante,* at 34 (emphasis deleted). It plays a
critical role in Congress' constitutionally based effort to
create an efficient, effective federal bankruptcy system.
At the least, that is what Congress concluded. We owe
deference to that determination, which shows the absence
of any legislative or executive motive, intent, purpose, or
desire to encroach upon areas that Article III reserves
to judges to whom it grants tenure and compensation
protections.

Considering these factors together, I conclude that, as in
*Schor,* "the magnitude of any intrusion on the Judicial
Branch can only be termed *de minimis.*" 478 U. S., at 856.
I would similarly find the statute before us constitutional.

## III

The majority predicts that a "practical matter" to-
day's decision "does not change all that much." *Ante,* at
36–37. But I doubt that is so. Consider a typical case:
A tenant files for bankruptcy. The landlord files a claim
for unpaid rent. The tenant asserts a counterclaim for
damages suffered by the landlord's (1) failing to fulfill his
obligations as lessor, and (2) improperly recovering pos-
session of the premises by misrepresenting the facts in
housing court. (These are close to the facts presented in
*In re Beugen,* 81 B. R. 994 (Bkrtcy. Ct. ND Cal. 1988).)
This state-law counterclaim does not "ste[m] from the
bankruptcy itself," *ante,* at 34, it would not "necessarily be
resolved in the claims allowance process," *ibid.,* and it
would require the debtor to prove damages suffered by the
lessor's failures, the extent to which the landlord's repre-
sentations to the housing court were untrue, and damages
suffered by improper recovery of possession of the prem-
ises, cf. *ante,* at 33-33. Thus, under the majority's holding,
the federal district judge, not the bankruptcy judge, would
have to hear and resolve the counterclaim.