# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE: | |
| VAN E. CHRISTIAN, II, <br>     Debtor. | Case Number: 10-09108 <br> Chapter 7 <br> Hon. George C. Paine, II |
| JOHN AND CONNIE MCCASLIN <br>     Plaintiffs | |
| v. | Adversary Number: 11-0068A |
| VAN E. CHRISTIAN, II <br> TALBOTT TITLE & <br> ESCROW, LLC <br>     Defendants. | |

## MEMORANDUM

This matter is before the court on an adversary complaint filed by John and Connie McCaslin (hereinafter "McCaslins") against the debtor, Van E. Christian, II (hereinafter "debtor" or "Christian") asking the court to hold nondischargeable a debt resulting from the failure of debtor's business, Talbot Title & Escrow, LLC.[1] The McCaslins argue that their two loans to the debtor personally were made based on fraudulent representations by the debtor, and therefore the debt is nondischargeable pursuant to 11 U.S.C. §§

---

[1] The adversary proceeding was originally filed against Van E. Christian, II, Spencer Talbott, Rhonda Talbott, and Talbott Title & Escrow, LLC. The McCaslins nonsuited Spencer and Rhonda Talbott. Since a corporation or LLC does not receive a discharge, a nondischargeabilty action against Talbott Title & Escrow, LLC is illusory and therefore, moot.

523(a)(2), 523(a)(4), and/or 523(a)(6). For the reasons cited more fully herein, the court finds that the plaintiffs failed to show by a preponderance of the evidence that the debts owed by Christian are nondischargeable, and therefore dismisses this adversary proceeding.

John McCaslin is a Certified Public Accountant, and currently vice president of Internal Audit at VanGuard Health Systems. He and his wife met Van Christian in 2008. The parties realized that they had children who attended the same school, and began discussing certain business opportunities. The McCaslins had some capital to invest, and were considering several options including real estate. Originally, according to McCaslin, they approached Christian about investing. Christian owned and operated Christian Corporation, a real estate company that "flipped" properties, as well as National Car Wash. Christian was also an investor in Talbott Title & Escrow, LLC (hereinafter "TT&E").

McCaslin testified that in 2009 the debtor asked him to help straighten out the tax and accounting problems at Talbot Title & Escrow, LLC. As an accountant, McCaslin was happy to help, and originally was not paid for any work. Mrs. McCaslin also helped by making data entries into their "QuickBooks" accounting software, and writing checks for the company. From November 2009 through January 2010, the McCaslins and Christian worked closely together reconstructing and categorizing income and expenses in order to create financial statements that would allow TT&E to file tax returns for tax years 2008 and 2009.

McCaslin was given access to TT&E's bank accounts. The electronic access to the Pinnacle Bank operating account also included full electronic access to TT&E's escrow account. According to McCaslin, he was told by TT&E principals, including Christian, that all monies in the escrow account came from closings by the business and all money

transferred from the escrow account to the operating account was income to TT&E. During November and December 2009, the McCaslins sent emails to Christian and Talbott requesting information about expenditures of TT&E, and asked about the income in the operating account. In those emails, McCaslin was attempting both to learn and understand the title and escrow business, and ascertain proper categorization of expenses. In addition, he wanted to understand why TT&E was experiencing cash flow problems.

The testimony of Christian and the testimony of the McCaslins all indicate that Christian was completely forthcoming in his answers to the McCaslins. The McCaslins and Christian spent time together socially at the McCaslin's home, and also worked closely together trying to understand 2008 and 2009 expenses. McCaslin indicated that at all times during this period, Christian continued to represent that all money coming from the escrow account to the operating account, and that all deposits into the operating account were income to TT&E. Christian does not dispute that testimony.[2]

By early December 2009, McCaslin had most of 2008's records completed, and TT&E was close to being ready to file 2008 tax returns. Based on his review of the financials of TT&E, and based on the representations of the TT&E principals, McCaslin determined that if TT&E controlled its payroll expenses, and draws by the principals, then TT&E would be a profitable enterprise. McCaslin testified that he felt good about the financial health of TT&E.

The McCaslins <u>offered</u> to loan money the debtor personally to pay TT&E's tax expenses and outstanding payables. On December 15, 2009, Christian and Spencer

---

[2] McCaslin testified that he was told by the TT&E principals that the escrow account was required to be reconciled monthly by TT&E underwriters, Old Republic, and that the monthly reconciliation was being done by an entity called Escrow Pros. Christian does not dispute these facts.

3-U.S. Bankruptcy Court, M.D. Tenn.

Case 3:11-ap-00068   Doc 31   Filed 10/12/11   Entered 10/12/11 13:01:58   Desc Main
Document   Page 3 of 9

Talbott signed a promissory note to the McCaslins for $80,000.00. McCaslin did not give the $80,000.00 directly to Spencer Talbott or to Van Christian, but instead paid the tax bill of TT&E and TT&E's outstanding payables directly.

At the end of December 2009, McCaslin sent TT&E's principals a potential Profit and Loss Statement for 2010 indicating that by his calculations, 2009 showed a TT&E profit of $51,246.00. However, holding revenues flat for 2010, McCaslin forecasted that TT&E would show a loss of $102,224.00. McCaslin suggested that a change in payroll costs would be necessary to break even for 2010 if revenues remained flat.

The parties continued to work together closely in the December 2009- January 2010 time frame. They held what they called "classification parties" at the McCaslin's home where they would gather socially, and then classify TT&E expenses. On January 18, 2010, the McCaslin's agreed to make a "bridge loan" of a $35,000.00 revolver to Spencer Talbott and Van Christian. McCaslin sent an email to Spencer Talbott and Van Christian indicating that that the purpose of the revolver was to help TT&E with the current cash flow deficits. All but $500 of the total balance had been drawn down by the end of January 2010.

Around the time the $35,000.00 line of credit was established, Christian offered the McCaslins a lien on the real property where TT&E operated. An August 2009 appraisal showed a fair market value of approximately $610,000.00. McCaslin's own testimony was that he did not request this security, but that the lien was offered by Christian as a gesture of good faith. The parties formalized the lien as security for both loans made by the McCaslins.[3]

---

[3] The McCaslin's pleadings indicated that the debtor's valuation of this property in his petition ($174,000 based on the Davidson County tax card) showed that Christian knew the security offered was illusory. However, in court, McCaslin's testimony was that he and his wife were third lienholders and never

In February 2010, McCaslin testified that he got a "frantic" phone call from the debtor indicating there was a shortage in TT&E's escrow account. That evening, the McCaslins, Spencer Talbott and Van Christian met at the McCaslin's house. McCaslin testified that Spencer Talbott did most of the talking and seemed the most agitated, and explained that funds were needed to cover the escrow account deficiency that was only referred to as a "shortage." The McCaslins told the debtor and Talbott that they would not lend money to cover the "shortage."

The undisputed testimony was that Spencer Talbott was loaned money from Rhonda Talbott, a family member, to cover the shortage. McCaslin saw online that the escrow account had been, in his words, "made whole" by the loan from Rhonda Talbott. After this incident, the parties continued to work together. McCaslin testified that, despite his unlimited access to the escrow account online, at no time did he suspect that any of the problems with the escrow account had affected the overall profit position of TT&E.

On March 9, 2010, McCaslin received an email from the debtor asking how to account for the money that Rhonda Talbott loaned. McCaslin testified that at this point, he realized for the first time that TT&E's income for 2009 was overstated by $89,000 because that much money had been transferred to the operating account in error. Thus, instead of a $51,000 profit in 2009, TT&E had an approximately $40,000 loss. It was then, McCaslin says that he learned that the escrow account had not been reconciled monthly by an independent third-party as Christian had told him. He testified that he realized, at that point, that he and his wife had decided to loan money to the debtor and Talbott

---

expected to see any return from this property. In fact, he testified the land had nothing to do with the loan. The court finds any allegations raised by the McCaslins seeking nondischargeability based on the valuation of the property are moot.

based on false representations and misleading information.

The McCaslins stayed on at TT&E until the business was closed down in the spring of 2010 when Old Republic ceased serving as TT&E's underwriter. The McCaslins contend that Christian fraudulently and/or intentionally provided false and misleading information in order to obtain the loans made by the McCaslins.[4] Christian, denies these allegations.

In order to except a debt from discharge under § 523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss. **Rembert v. AT & T Universal Card Servs., Inc**., 141 F.3d 277, 280–81 (6th Cir.1998). The McCaslins do not even approach the vicinity of showing by a preponderance of the evidence that the debtor knew or acted with gross recklessness, or that they justifiably relied, or that their reliance was the proximate cause of their loss.

Christian's undisputed and credible testimony was that he ran three businesses out of the property were TT&E was located. He ran Christian Properties, National Car Wash, and was an initial $150,000.00 investor in TT&E.[5] Christian's involvement with TT&E on a daily basis started around the same time that the McCaslins became involved with TT&E, and up until that point, Christian had been only an investor. Christian testified that he

---

[4]Part of the McCaslins' allegations are that the debtor continually reaffirmed the numbers and financials the McCaslins prepared for TT&E. However, it seems preposterous to argue that the McCaslins were misled by their own financials when they prepared the financial information. Because there was no proof that the debtor knew of any financial problems with TT&E until the McCaslins knew, the court finds the McCaslins argument that the debtor "affirmed" the financial accounting McCaslin prepared, circular at best.

[5] Christian's capital investments in TT&E ended up being closer to $250,000.00. He did not recover this investment.

was learning the workings of TT&E at the same time the McCaslins were, and that he believed, just like the McCaslins, that TT&E was profitable, the escrow account was being reconciled monthly, and that the financial health of the company was good. In fact, Christian's unrebutted testimony was that he learned of the "shortage" in the escrow account from Spencer Talbott on the day prior to the McCaslins learning about it. Even after the escrow "shortage" incident, the debtor continued to provide all the information he had to the McCaslins including attempts to gain access to certain TT&E bank accounts on which Spencer Talbott was the only signatory.

Christian also testified, credibly and unrebutted, that Spencer Talbot was the supervisor of the escrow account, and was the sole administrator on the account software. Any employee in the escrow account was traced by his/her initials. Spencer Talbott, who was the manager of the title company, and served as administrator of the software, had full access to see and track the escrow account.

McCaslin is an accountant, who worked at TT&E, and had full access to the escrow account online. His decision to accept representations that all income from the escrow account to the operating account was income to TT&E, was at his own peril. He is a certified accountant, and had interest in investing in this business.[6] Any information Christian provided him that turned out to be inaccurate was not because Christian was intentionally misleading him or attempting to deceive him. Christian clearly believed in

---

[6] The McCaslins were hoisted on their own petard. McCaslin cannot claim he was misled by the debtor because he relied on all the information the debtor gave them. Even if that it is true, and some of the information given to them by the debtor was false, there is absolutely no proof that the debtor knew it was false. McCaslin was an accountant who <u>offered</u> to loan money to this debtor personally, but with the expectation he would be repaid by TT&E based on financials he prepared.

7-U.S. Bankruptcy Court, M.D. Tenn.

TT&E as a business venture, and like the McCaslins lost all his money.[7]

The court finds no proof at all that Christian misled the McCaslins. All of the evidence, and even McCaslin's own testimony, indicate that this was nothing more than a failed business venture where both the McCaslins and the debtor lost money. Christian never personally held any of the McCaslin funds.[8] The court finds no false suggestions, no suppression of the truth nor other devious or multifarious means to secretly separate the McCaslins from their money. To the contrary, the court finds only acquaintances, one-time friends, who lost money in an unsuccessful business venture that fell apart either by failing to turn a profit, or perhaps by the inappropriate actions of another. The only proof before the court was that the business closed when Old Republic withdrew as TT&E's underwriter.

The court finds no fraud pursuant to section 523(a)(2)(A). Sections 523(a)(2)(B), (a)(4), and (a)(6) all require proof of fraud or intentional acts. Having found no fraud under 523(a)(2)(A), the court likewise, and for all the reasons given above, finds the McCaslins failed to carry their burden under §§ 523(a)(2)(B), (a)(4) and (a)(6). This is not a case riddled with fraud, lies, and deceptions, or clever schemes by the debtor to cheat the McCaslins, but instead another fizzled real estate enterprise that failed in tough economic times. Both parties lost their money.

The court therefore dismisses the McCaslins adversary proceeding against the

---

[7]In fact, McCaslin's own summary of the escrow accounts shows that the escrow reconciliation reflected no irregularities in the escrow account until January 2010. Thus, at least to an untrained analyst, Christian would have seen no discrepancies to report to the McCaslins. McCaslin, as an accountant, however, might have noticed irregularities, if they existed prior to January 2010 in the escrow account, had he chosen to examine those records as the accountant for TT&E.

[8]Both the McCaslins agreed that the McCaslin's initial loan to the debtor was not in the form of cash, but instead McCaslin paid the Internal Revenue Service on behalf of TT&E and certain other outstanding payables on behalf of TT&E.

debtor, and finds that they failed to show by a preponderance of evidence that the debts owed by the debtor should be nondischargeable. The court instruct counsel for the debtor to prepare an order not inconsistent with this court's opinion within fourteen (14) days of entry of this Memorandum Opinion.